UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

|  |  |  |
|---|---|---|
| Dynamic Network Services, Inc., | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 06-CV-0037 |
| Timothy Wilde, | ) | |
| Defendant | ) | |

## FIRST AMENDED COMPLAINT

NOW COMES the Plaintiff, Dynamic Network Services, Inc. ("DynDNS" or the "Company"), by and through its attorneys, Sheehan Phinney Bass + Green, Professional Association, and complains against the Defendant Timothy Wilde ("Wilde") as follows:

## INTRODUCTION

This is an action to enforce an agreement between the Plaintiff corporation and one of its shareholders, Wilde, to repurchase Wilde's shares pursuant to the terms set forth in the Corporation's offer, which was agreed upon by the Defendant and the full DynDNS Board of Directors. Approximately one week after the Corporation and Wilde reached a deal to repurchase, in the case of DynDNS, and to sell, in the case of Wilde, the shares for a substantial consideration, the Defendant simply reneged on the deal and told the Company that he required a very substantially higher consideration. The Plaintiff DynDNS now respectfully brings this action for breach of contract and seeks specific performance of the terms and conditions agreed upon by the parties and approved by the Board of Directors, including Wilde.

## PARTIES, JURISDICTION AND VENUE

1.      The Plaintiff, DynDNS, is a Delaware corporation with its principal place of business at 1 Sundial Avenue, Suite 301, Manchester, New Hampshire 03103.

2.      The Defendant Wilde is an individual residing at 1175 Lake Boulevard, No. 105, Davis, California 95616.  In addition to owning 56% of the stock of DynDNS, Wilde is a member of its Board of Directors and is a contract consultant to the Corporation, pursuant to a Consulting Agreement with the Plaintiff DynDNS dated August 31, 2005.  The Defendant is within the in personam jurisdiction of this Court, because he is the majority shareholder, a contractual consultant pursuant to an agreement that calls for the application of New Hampshire law, and because of his consistent and substantial daily contact with the Plaintiff Company's headquarters and personnel in Manchester, New Hampshire.

3.      The remaining shareholders of the Plaintiff DynDNS are: Jeremy Hitchcock ("Hitchcock"), the owner of 22% of the outstanding shares of the Plaintiff, who is also a Director, and Chief Executive Officer and the Chief Financial Officer of the Company; and Thomas J. Daly ("Daly"), the owner of 22% of the outstanding shares of the Plaintiff, who is also a Director, and the Company's President and Chief Technology Officer.

4.      The Court has subject matter jurisdiction over the matter pursuant to 28 U.S.C. 1332(a)(1) because the Plaintiff and the Defendant are citizens of different states and thus the parties are completely diverse.  The matter in controversy exceeds $75,000.00 exclusive of interest and costs because the stock repurchase agreement called for the payment of more than $1,200,000.00 to Wilde.

5.      Venue is proper in this Court under 28 U.S.C. 1391 because a substantial part of the events and transactions giving rise to the claims below occurred in this judicial district.

## ALLEGATIONS COMMON TO ALL COUNTS

### A.    Background

6.    DynDNS provides domain name system services to its clients, allowing its clients to maintain a stable domain name system address, thereby making it easier for its clients to be identified on the Internet.

7.    Wilde founded what was to become DynDNS in 1998 while he was in high school. In the fall of 1999 Wilde matriculated to Worcester Polytechnic Institute ("WPI") where he became friends with another WPI student, Christian T. Reinhardt, IV ("Reinhardt"). Wilde and Reinhardt began to operate the Company as a de facto partnership.

8.    Daly and Hitchcock matriculated to WPI in August of 2000 where Daly, Hitchcock and Wilde met and became friends. Shortly after the three became friends, Wilde, Daly, and Hitchcock discussed DynDNS and Daly and Hitchcock began to help Wilde with the Company.

9.    That fall, in October of 2001, without using counsel, Wilde and Reinhardt formed Dynamic DNS Network Services, LLC. Hitchcock prepared the paperwork for the LLC formation and trade name reservation. Wilde and Reinhardt each owned 50% of the LLC.

10.    The next spring, in March of 2002, Wilde negotiated a lease and the Company moved into its first office. In April 2002, Wilde began working as a full-time salaried employee for the Company. During the summer of 2002 Reinhardt began working as a part-time salaried employee for the Company.

11.    In October of 2002, Wilde and Daly discussed Daly's role in the Company and Daly became a paid staff member. After a similar discussion between Wilde and Hitchcock, Hitchcock became a paid staff member in November 2002.

B.    **The 2003 Reorganization**

12.    In April of 2003 Wilde, Reinhardt, Hitchcock and Daly began to discuss reorganizing the Company to include Hitchcock and Daly as shareholders.

13.    In these negotiations, Wilde, Reinhardt, Hitchcock and Daly, agreed, inter alia, that the Company would reorganize as an S-Corporation, that Hitchcock and Daly would become minority shareholders, and that the Company would enter into employment contracts with each of Wilde, Reinhardt, Hitchcock and Daly.  Neither the Company's corporate counsel, nor attorneys for any of the individuals were present for the negotiations.

14.    After Wilde, Reinhardt, Hitchcock and Daly reached an agreement on the essential terms of the reorganization plan, Hitchcock was asked to consult with the Company's corporate counsel on how to implement the plan that the four had agreed upon.

15.    After consulting with the Company's corporate counsel, Hitchcock discussed the recommendations of the Company's corporate counsel with Wilde, Reinhardt, and Daly.  After this discussion, the parties agreed that the Company's corporate counsel would draft the documents necessary to accomplish the reorganization plan.

16.    On July 31, 2003 Wilde, Reinhardt, Hitchcock and Daly signed the legal documents implementing and memorializing the reorganization plan.

17.    By the fall of 2003 Daly and Hitchcock were full-time employees.  In the Spring of 2004 the Company relocated its offices to Manchester, New Hampshire.  By May 2004 Wilde, Daly and Hitchcock had all moved to Manchester and were working as full-time salaried employees for the Company.

18.    In the summer of 2004 Wilde, Daly and Hitchcock agreed that they needed to terminate Reinhardt's employment with the Company.  The Company sent Reinhardt a letter

informing him that he had been terminated for cause and making a settlement offer that would compensate him for his interest in the Company.

### C.    The 2005 Restructuring

19.    In the fall of 2004 Wilde began to travel to California for personal reasons. After the turn of the year, in January of 2005, Wilde began working two weeks a month from Davis, California. In February 2005, Wilde for the first time raised the issue of his departure from the Company.

20.    In March 2005, Wilde made it known that he was seeking employment at other companies, announced to the Company that he was "working on his resume," and had one or more interviews with prospective new employers. At the same time, Wilde, Daly, and Hitchcock meet with the Company's corporate counsel to discuss a buyout of Wilde's interest. However, in late March 2005 Wilde went on vacation and, upon his return, let it be known that he was not then ready to be bought out.

21.    In the late spring of 2005 Wilde indicated that he would be moving to California full-time. After this announcement, during the early summer of 2005, Wilde, Hitchcock and Daly began to discuss restructuring Wilde's role in the Company.

22.    After negotiating for a few weeks in July 2005, Wilde, Hitchcock and Daly reached an agreement on a restructuring plan. Here again, neither the Company's attorney nor any personal attorneys for Wilde, Daly or Hitchcock were involved in negotiating the plan. The restructuring plan agreed upon by Wilde, Daly, and Hitchcock provided that, inter alia, Wilde would become a consultant to the Company; the Company's By-Laws would be amended to allow Wilde to retain his position on the Company's Board of Directors; and the Company's Shareholders Agreement would be amended so as to allow Wilde to continue to hold his stock.

23.     In late July 2005, Hitchcock communicated the agreed-upon terms of the restructuring plan to the Company's corporate counsel. The Company's corporate counsel drafted the legal documents necessary to memorialize and implement the agreed-upon restructuring plan and returned them to Wilde, Hitchcock, and Daly.

24.     On August 4, 2005 Wilde, Hitchcock and Daly executed the documents memorializing and implementing the restructuring plan.

25.     On August 5, 2005 Wilde left New Hampshire for California. In early September 2005 Wilde moved into his new location in California and, by the end of that month, again began working full-time for the Company as a consultant pursuant to the Consulting Agreement.

**D.     The Negotiations and Agreement to Repurchase Wilde's Shares**

26.     After Wilde's departure in August, during the fall of 2005, the relationship between Wilde and Daly and Hitchcock became increasingly strained. In late October, Wilde, Daly and Hitchcock gathered telephonically for a series of meetings with the Company's corporate counsel, during which they discussed their relationship and the direction of the Company. In these teleconferences Daly and Hitchcock raised the issue of buying out Wilde. Wilde indicated that he was not ready to be bought out of the Company.

27.     Notwithstanding the October teleconferences, relations between Wilde and Daly and Hitchcock continued to deteriorate. Eventually Wilde, Daly and Hitchcock agreed that Wilde would return to New Hampshire for face-to-face meetings between December 19 and 23, 2005 so that the three of them – the Executive Officers, Directors and Shareholders of the Company – could discuss a number of issues relating to the operation of the Company.

28.     On Tuesday, December 20, 2005, in a heated exchange, Wilde, Daly and Hitchcock discussed whether Wilde, on the one hand, or Daly and Hitchcock, on the other, should leave the Company.

29.     The following day, Wednesday, December 21, 2005, Wilde, Daly and Hitchcock met with an accounting consultant and the Company's corporate counsel to discuss the fact that the Company, for a variety of reasons, needed to alter the nature of Wilde's consulting contract or make him an employee.

30.     After the accountant left the teleconference, the discussion again turned to a buyout of Wilde's interest in the Company.  At that point, Wilde set forth terms under which he would accept a buyout offer for his interest in the Company.  Among other things, Wilde indicated that he wanted  between $1,600,000.00 and $1,800,000.00 for his interest in the Company, that he wished the sum to be paid over six or seven years, and that he wished to have a "clean break" with the Company.

31.     After further discussions of the buyout, Wilde, Hitchcock and Daly agreed that they would revisit the issues under discussion after the holidays.

32.     In early January 2006, Wilde e-mailed the Board to discuss the next steps for the Company given their December discussions concerning a potential purchase of Wilde's shares in the Company.

33.     After Wilde's e-mail to the Board, Hitchcock, the Company's Chief Executive Officer and Chief Financial Officer, and Daly, the Company's President and Chief Technology Officer, discussed amongst themselves the potential terms of a buyout plan whereby the Company would purchase Wilde's interest in the Company and Wilde would transition out of the Company. On the evening of January 12, Daly sent Wilde a proposed buyout plan, which included many of

the terms that Wilde had previously proposed.  Wilde insisted that the draft buyout plan state at

the beginning that it was an offer by the Company to him to purchase his interests in the

Company.  The draft buyout plan, entitled "Intent to Purchase," was extensive and exhaustive.

Among other things, the plan: (1) contained an offer by the Company to buy Wilde's shares for

$1,275,523.38; (2) called for a closing date of February 1, 2006; (3) provided a detailed recitation

of the documents and things that would be brought to the closing by Wilde, as seller, and the

Company, as purchaser; and (4) included the details of a "transition phase" after which Wilde

would completely sever his relationship with the Company.

     34.     Between approximately 2:00 and 3:00 P.M. the following afternoon, January 13,

2005, Wilde, Daly and Hitchcock discussed by teleconference the draft buyout plan that the

Company had proposed.  In this teleconference, Wilde made counter-offers on a number of the

material elements of the buyout plan.  At the beginning of the teleconference Wilde indicated that

the counteroffer he was about to present was his "final offer" and that he did not wish to

negotiate regarding his demands.  In his counter-offer, which focused almost solely on financial

matters, Wilde asked for a total buyout consideration of $1,500,000.00 (an amount in excess of

the current the fair market value agreed to by Wilde in the Amended and Restated Stockholders'

Agreement dated August 31, 2005) and for certain concessions on tax issues.  In addition, he

presented three options, two during the telephone conversation and one via email, by which the

Company could reach the total buyout number.  As was the case with the 2003 reorganization

negotiations and the 2005 restructuring negotiations, neither the Company's corporate counsel,

nor attorneys for Wilde, Hitchcock, or Daly were present during these negotiations.  Hitchcock

and Daly informed Wilde that they would review the terms of his counter offer and contact him

when they made a decision.

35.     After discussing Wilde's counter offer amongst themselves, Hitchcock and Daly initiated another teleconference with Wilde at around 4:15 P.M on the afternoon of January 13, 2006.  In this second teleconference Hitchcock and Daly informed Wilde that they agreed to the terms of his counteroffer, including the demand that the Company pay Wilde an up-front $55,000.00 in cash at the closing and the demand that the overall buyout consideration total $1,500,000.00 from the Company.

36.     After Daly and Hitchcock informed Wilde of the Company's agreement to, or capitulation on, these points, Wilde, Daly, and Hitchcock went through the rest of terms of the draft buyout plan line by line.  At the conclusion of this review of the draft plan they agreed that these would be the final terms of the buyout plan and Daly stated that he would revise the document they were working with so that it would fully represent all the changes to which the Company, Daly, Wilde and Hitchcock had agreed.

37.     After making these revisions Daly sent out the terms of the agreed upon buyout plan to Wilde and Hitchcock via the Company's Board of Directors email list serve (i.e., board@dyndns.com) for Board memorialization of the agreement.  Shortly thereafter, Hitchcock responded stating, "That looks good to me.  If it's something that we all agree on, I'll send this off to Michael asking him to begin drafting the necessary documents to reflect this plan." Shortly after Hitchcock sent this email, Wilde responded with an email to the Board of Directors email list-serv that stated "This [the agreed upon buyout plan that was attached to the email] matches up correctly to our discussions, as I see it, so I am happy with it being sent to Michael [the Company's corporate counsel] for him to begin preparing documents."  Wilde accepted the Company's offer and formed a binding agreement.

38.    The "plan" agreed-upon contained all of the essential and material elements of the Stock Repurchase Agreement, including the following:

A.    A description of the phases of the Agreement, in which (1) the parties agree to work with counsel to draft the final documentation; (2) the Agreement is closed; and (3) there is a "transition" of Wilde's responsibilities to a new or another employee in the Company;

B.    Each party's specific responsibilities at the Closing (e.g., "What Tim Wilde will provide at Closing" and "What the Company will provide at Closing"), including the delivery of cash and certain subsidiary agreements concerning, inter alia, Wilde's retention of a security interest in the repurchased stock, and non-competition and non-disclosure covenants from Wilde for a period of four years, two years less than the period of pay-out under the terms of the Agreement;

C.    A detailed description of the "responsibilities" to be "documented and transferred" upon Wilde's departure from the Company; and

D.    A complete payment schedule for "cash at closing" and ensuing monthly payments to be made to Wilde in accordance with the Agreement commencing February 1, 2006 through and including April 1, 2012, yielding a total cash compensation of $1,500,189.00.

See Exhibit A, annexed hereto. The Company's proposal and the resulting Agreement was expressly intended to and did meet Wilde's expressed "final offer" and was intended to be, and was in fact, a binding Agreement between the Company and Wilde.

39.    On January 13, 2006, approximately one half hour after Wilde's acceptance of the proposal with the changes demanded by him, and after the Board's unanimous approval and

ratification of the buyout plan to which Wilde, Daly, and Hitchcock had personally agreed, Hitchcock emailed the Company's corporate counsel asking him to "draft up the necessary agreement(s) … in line with the attached plan[.]"

40.     In fact, in the days immediately following his acceptance of the Company's offer to purchase his shares, Wilde began to carry out the terms of the Agreement by, inter alia, creating a compilation of his duties with the Company as its System Administrator in accordance with the "transition phase" of the Agreement, and so informed the Company's President and Chief Executive Officer.

### E.     Wilde's Attempt to Repudiate the Agreement

41.     On Friday, January 20, 2006 the Company's corporate counsel sent the documents that would implement and memorialize the agreed upon and ratified buyout plan to Wilde, Daly and Hitchcock.

42.     On Sunday, January 22, 2006 the Company's corporate counsel received a letter from Attorney John Marlow informing him that Attorney Marlow represented Wilde and that "upon further review" Wilde had decided to "reject" the Agreement.  In addition, the letter stated that Wilde would continue to act as a consultant to the Company under the terms of his August 2005 consulting agreement.

43.     On Tuesday, January 24, 2006 Daly and Hitchcock had a conversation with Wilde regarding Wilde's attempt to renege on the agreed-upon and ratified buyout agreement.  Wilde informed Daly and Hitchcock that if the Company still wished to buyout his interest in the Company, that the Company would need to pay Wilde $5,000,000.00, all of which would need to be paid at closing.

**F.**    **The Plaintiff is Ready, Willing and Able to Implement Agreement, and Has Informed Wilde That It is Prepared to Do So**

44.    The Company is ready, willing and able to carry out the agreed purchase of Wilde's shares, pay him the agreed up front cash, deliver and execute the ancillary documents required by the agreement, and begin paying Wilde the installment payments in accordance with the agreement.

45.    The Company has informed Wilde by letter dated January 31, 2006 that it is prepared to carry out the terms of the agreement and expects Wilde to do so as well.

**COUNT I**
**BREACH OF CONTRACT/ANTICIPATORY BREACH**

46.    The allegations contained in Paragraphs 1 through 45 above are hereby repeated and incorporated by reference.

47.    The Plaintiff Company, acting through its officers and with the agreement and knowledge of all of its shareholders and a unanimous Board of Directors, and the Defendant had and have a valid and enforceable Agreement under which the Company will purchase Wilde's shares in the Company and, in exchange, Wilde will deliver his shares to the Company and make certain other undertakings.  Specifically, the Plaintiff and the Defendant agreed that in exchange for his shares, the Defendant Wilde will be paid over a six-year period a total cash compensation of $1,500,189.00, in addition to other non-cash compensation.

48.    The shares of stock in the Company to be delivered to the Company in accordance with the Agreement are unique property that cannot be fully replicated or compensated by money damages.

49.    The Plaintiff Company is ready, willing and able to carry out the terms of the Agreement as intended by the parties, and is in compliance with any and all conditions to its

performance of the Agreement.  Legal remedies, if any, are insufficient to place the Plaintiff in the same position it would be in if the Defendant Wilde had not repudiated and breached the Agreement.

50.     Wilde materially breached his agreement by expressly repudiating the Agreement, and failing and/or refusing to carry out his obligations to, among other things, undertake the duties and obligations set forth in the Agreement and deliver the shares in accordance with the Agreement reached by the parties, and by demanding additional compensation therefore.

51.     The Plaintiff has been harmed by the Defendant Wilde's repudiation and breach of the Agreement, which harm can only be remedied and compensated by an order directing the Defendant to specifically perform the terms and conditions agreed upon by the parties.

52.     In the alternative, the Plaintiff is entitled to all of its damages.

**COUNT II**
**PROMISSORY ESTOPPEL**

53.     The allegations contained in Paragraphs 1 through 52 above are hereby repeated and incorporated by reference.

54.     In the alternative, the Defendant made an express and specific promise to sell his shares in the Company for a valuable consideration, which was intended to induce action on the part of the Plaintiff Company.

55.     The Company and its other shareholders relied upon the Defendant Wilde's promise to their detriment and/or to the benefit of the Defendant Wilde, as promisor, and acted in furtherance of the promise or promises made by the Defendant.

56.    The promise or promises made by the Defendant Wilde are binding and enforceable and injustice can only be avoided by the enforcement of the express and specific promises made by the Defendant.

### RELIEF REQUESTED

WHEREFORE, DynDNS respectfully requests that this Honorable Court:

A.    Grant it an Order enforcing the Agreement and directing Wilde to specifically perform the duties and actions called for in the Agreement;

B.    In the alternative, grant it an Order enforcing the agreement to the extent of directing the parties to negotiate and conclude a formal agreement within the scope of, and consistent with, the preliminary agreement and plan agreed upon by the parties on January 13, 2006;

C.    Grant it an Order enforcing the promise or promises made by the Defendant and relied upon to its detriment by the Company, as justice requires; and

D.    Grant the Plaintiff such other and further relief as the Court deems just and equitable.

Respectfully submitted,

**Dynamic Network Systems, Inc.**

By Its Attorneys,

**SHEEHAN PHINNEY BASS + GREEN,
PROFESSIONAL ASSOCIATION**

Dated: March 15, 2006                    By:____/s/  Christopher Cole_____
                                         Christopher Cole, NH Bar No. 8725
                                         John-Mark Turner, NH Bar No. 15610
                                         1000 Elm Street
                                         P.O. Box 3701
                                         Manchester, New Hampshire 03105-3701
                                         (603) 627-8223
                                         ccole@sheehan.com
                                         jturner@sheehan.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the within First Amended Complaint was this day mailed conventionally by U.S. regular mail to the Defendant Timothy Wilde at this last know address of Timothy Wilde, 1175 Lake Boulevard, No. 105, Davis, CA 95616.

Dated: March 15, 2006                    By:_____/s/  Christopher Cole_____
                                         Christopher Cole, NH Bar No. 8725